# IN THE COURT OF APPEALS OF IOWA

No. 23-1066
Filed August 30, 2023

**IN THE INTEREST OF A.G, A.M., A.M., G.H., and S.H.,**
    **Minor Children,**

**J.H., Father of A.M. and S.H.,**
    Appellant,

**M.M., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Webster County, Joseph L. Tofilon, District Associate Judge.

A mother appeals the termination of her rights to five children, and the father appeals the termination of his rights to two children. **AFFIRMED ON BOTH APPEALS.**

Ricki L. Osborn Stubbs of Osborn Stubbs Law Office, P.C., Fort Dodge, for appellant father of A.M. and S.H.

Brandy R. Lundy of Lundy Law, PLC, Fort Dodge, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie L. Moran, Assistant Attorney General, for appellee State.

Gregory H. Stoebe, Humboldt, guardian ad litem for minor children.

Becky Wilson, Iowa Falls, attorney for minor children.

Considered by Tabor, P.J., and Schumacher and Buller, JJ.

**BULLER, Judge.**

A mother appeals the termination of her parental rights to five children. The father of two of those children, J.H., also appeals the termination of his rights. Following guilty pleas, the mother is imprisoned for allowing the children to be abused. And J.H. is jailed pending trial on multiple felony counts relating to physical and sexual abuse of the children. We separately affirm termination of both parents' rights and reject all challenges made in their petitions on appeal.

## I.    Background Facts & Proceedings

This appeal is about five children:

- A.G. was born in 2013 to the mother and a father not at issue in this appeal;

- Ad.M. was born in 2015 to the mother and a second father not at issue in this appeal;

- G.H. was born in 2016 to the mother and the second father;

- S.H. was born in 2017 to the mother and J.H; and

- Ar.M. was born in 2019 to the mother and J.H.

At the point this case began, all of the children were in the care of the mother and J.H.

This family originally came to the attention of the Iowa Department of Health and Human Services (HHS) based on reports of poor conditions inside the home and the children coming to school with hygiene problems. An HHS worker observed that the home was "very dirty." She saw feces in the residence and believed that some of the children had lice.

Through the resulting assessment and subsequent forensic interviews, some of the children revealed that J.H. was physically abusing four of them and

sexually abusing at least two of them. As the HHS worker put it, the mother knew about this physical and sexual abuse "and seemingly did nothing to stop it." The children disclosed that J.H. would hit them, "choke"[1] them, and put his penis inside their mouths. HHS determined all the reports of abuse were founded.

As of the termination trial, J.H. was in jail pending trial on multiple felony charges for sexually abusing two of the children and for physically abusing four of the five. Criminal no-contact orders barred J.H. from contacting any of the children. The mother was in prison following her guilty plea to and conviction for four felony counts of child endangerment resulting in bodily injury. Criminal no-contact orders also barred the mother from contacting any of the children.

An HHS worker testified the children "are very, very fearful" of being returned to their mother and J.H. The children described both parents as "monsters" and detailed J.H. threatening them with firearms. The children are placed with their maternal grandparents in a safe and loving home and are content with their current living arrangements. The HHS worker described the children as "safe, happy, and healthy where they are." According to the grandparents, the children have also ceased problematic behaviors and inappropriate "acting out" since removal from the parents. The children's guardian ad litem (GAL) echoed this description, noting the younger children had a limited understanding of the legal proceedings but were happily settled into their new home, and the older

---

[1] We use the word "choke" because that is the language the children used when reporting the violence to HHS. We note the correct terminology would be "strangle." *See* Mary Pat Gunderson, *Gender and the Language of Judicial Opinion Writing*, 21 Geo. J. Gender & L. 1, 11 (2019) (on how language matters and noting that describing acts of strangulation as "choking" can minimize or mitigate).

children "clearly and directly" said that they never wanted to see the parents again. The grandparents are also licensed to foster and adopt, and they are willing to do so.

The State and GAL recommended termination of the parents' rights to all of the children, which the juvenile court granted. Ad.M. and G.H.'s father, as well as Am.G.'s father, consented to termination of their parental rights, and those fathers' rights are not at issue in this appeal. The mother and J.H. appeal.

## II.     Standard of Review

We review termination-of-parental-rights proceedings de novo. *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010). "[W]e may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence." *Id.*

## III.     Discussion

Neither parent makes a substantive challenge to the statutory elements supporting termination under Iowa Code section 223.116(1)(f) (2022). Both contest whether the best interests of the children support termination, whether HHS made reasonable efforts toward reunification, and whether the juvenile court should have granted a six-month extension of time. The mother also makes a challenge related to a permissive exception. We recognize that J.H. lacks standing to challenge termination of the mother's rights for children he did not father, *see In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020), but we address these claims jointly as they concern common facts.

### A. Best Interests of the Children

When determining best interests, we give primary weight to "the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental and emotional conditions and needs of the child." Iowa Code § 232.116(2). These factors all weigh in favor of termination.

In addition to the significant cleanliness and hygiene concerns that originally prompted HHS involvement, the children credibly reported physical and sexual abuse perpetrated by J.H. and enabled or permitted by the mother. The mother already pled guilty to four felony child-endangerment counts, and J.H. is jailed pending trial on multiple felonies related to physical and sexual abuse. The children's GAL said it well: "The kids have been through enough. They deserve a good, wholesome, quiet environment which they are enjoying right now. And neither of the parents, if exonerated or if released, can guarantee that." We agree with the juvenile court that termination is in the children's best interests.

### B. Reasonable Efforts

Both parents allege HHS did not make reasonable efforts toward reunification. The juvenile court rejected this argument below, as do we on appeal. "Although [HHS] must make reasonable efforts in furtherance of reunification, with some exceptions not applicable here, parents have a responsibility to object when they claim the nature or extent of services is inadequate." *In re L.M.*, 904 N.W.2d 835, 839–40 (Iowa 2017) (footnote omitted). "A parent's objection to the sufficiency of services should be made 'early in the process so appropriate changes can be made.'" *Id.* at 840 (quoting *In re C.B.*, 611 N.W.2d 489, 493–94 (Iowa 2000)). Here, the parents did not make specific objections or actionable

requests for services before the termination hearing. As a result, they waived their reasonable-efforts challenge. *See id.* ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding." (quoting *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002))). In short, while the parents complained at the termination trial about some things they wish HHS had handled differently, that complaint came too late.

### C. Another Six Months

Both parents also requested an additional six months to work toward reunification below, and they reiterate those arguments on appeal. The juvenile court rejected this request, as do we.

"[T]he juvenile court may deny termination and give the parent an additional six-months for reunification *only if* the need for removal 'will no longer exist at the end of the additional six-month period.'" *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021) (emphasis added) (quoting Iowa Code § 232.104(2)(b)). The mother's tentative prison discharge date is in 2025—well beyond six months following the termination trial. And even if her sentence were reconsidered and she were released sooner than that (a chain of circumstances that is at best speculative), we agree with the juvenile court that it would take more than six months for any realistic prospect of therapeutic reunification given her damaged relationship with the children and criminal failure to protect them.

J.H. was in jail awaiting trial on felony charges based on sexual and physical abuse of the children. We agree with the juvenile court that, "Even if [J.H.] were acquitted tomorrow, it will take much longer than 6 months for him to rehabilitate

his relationships with [the children]." And we note that, while J.H. and his attorney may hope for acquittal, J.H. admitted to the social worker that he expected "he is going to go to prison, just depends on for how long."

We affirm the juvenile court's denial of a six-month extension.

### D. Permissive Exception

Last, the mother asserts the permissive bond exception in Iowa Code section 232.116(3)(c) should thwart termination. The State asserts the mother did not advance this argument below, though we recognize the juvenile court seemingly ruled on the issue regardless. Assuming without deciding the issue is properly before us, we reject the mother's argument.

The juvenile court need not terminate parental rights if "termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). A parent resisting termination has the burden to prove this permissive exception by clear and convincing evidence, and our case law recognizes that, without more, neither a parent's love nor the mere existence of a bond is enough to prevent termination. *See In re A.B.*, 956 N.W.2d 162, 169–70 (Iowa 2021); *D.W.*, 791 N.W.2d at 707. We agree with the juvenile court that "no evidence, let alone clear and convincing evidence, was presented which indicates that termination would be detrimental to the children . . . due to the closeness of any parent-child relationship." The two older children's own words, as relayed by their GAL, support this finding:

> They wanted me to tell the [court] that nobody was innocent. And I asked them what they meant by that. And they said mom and [J.H.]. Neither one of them was innocent, that they want both of them to be punished and they never want to see them again. And they have no

desire to continue a relationship with either of them and want to just stay where they are and go on with their lives.

There is no factual basis for invoking the bond exception, and we reject the mother's argument to the contrary.

**IV.    Disposition**

We affirm the termination of the mother's parental rights to all five children and J.H.'s parental rights to S.H. and Ar.M.

**AFFIRMED ON BOTH APPEALS.**